**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re: | Chapter 11 |
|---|---|
| GRABIT, INC.,[1] | Case No. __________ (___) |
| Debtor. | |

**DECLARATION OF GREG MILLER IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Greg Miller, hereby declare under penalty of perjury:

1. I am the President and Chief Executive Officer of Grabit, Inc. ("Grabit" or the "Debtor") and have served in that capacity since 2016. I am also a member of the Debtor's Board of Directors. I have nearly thirty years of experience as an executive, including expertise in a variety of fields such as robotics, electronics, application development, distribution, and brand protection. I am fully familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records and am duly authorized to make this Declaration on the Debtor's behalf. If called upon to testify, I would testify competently to the facts set forth herein.

2. Concurrently with this Declaration, the Debtor is filing its pre-negotiated *Chapter 11 Plan of Reorganization of Grabit, Inc.* (as amended, supplemented, restated, or modified from time to time, the "Plan"),[2] as well as its disclosure statement in support of the Plan (as amended, supplemented, restated, or modified from time to time, the "Disclosure Statement"). The Plan provides for a debt-for-equity swap that will convert all of the Supporting Senior Secured Claims,

[1] The last four digits of the Debtor's federal taxpayer identification number are 6933. The Debtor's mailing address is 1042 N Higley Road, #102178, Mesa, Arizona 85205.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Term Sheet (defined below), as applicable.

which are held by BPG International Finance Co. LLC ("BPG"), to a single class of new common stock (the "New Common Stock") of the Reorganized Debtor. The chapter 11 case is being commenced following the negotiation and execution of the Term Sheet Relating to Resolution of Senior Secured Debt in Accordance with a Pre-Negotiated Proposed Chapter 11 Plan of Reorganization of Grabit Inc. (the "Term Sheet"), which forms the basis of the Plan. The Term Sheet is the culmination of months of negotiations among the Debtor, BPG, Holders of the Convertible Notes, and Holders of Interests, as well as the licensor of technology that is necessary to consummate the proposed restructuring.

3. To operate effectively and minimize certain of the potential adverse effects of the commencement of the chapter 11 case, the Debtor has requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Motions"). As described below, by way of the First Day Motions the Debtor seeks to (i) establish certain administrative procedures to promote a seamless transition into and through the chapter 11 case, (ii) ensure the continuation of its business operations without interruption, (iii) obtain debtor-in-possession financing and use cash collateral in the operation of its business, and (iv) preserve the value of net operating losses by placing restrictions on trading through the effective date of the Plan. In addition to the traditional "first-day" relief, given the pre-negotiated nature of the Plan with a substantial portion of those with economic interests in the case, the Debtor has filed its schedules and statements of financial affairs, a bar date motion, and a motion to approve the Disclosure Statement, establish solicitation procedures, and schedule confirmation of the Plan.

4. As further discussed below, I am familiar with the contents of each of the First Day Motions, and I believe the Debtor would suffer immediate and irreparable harm absent the ability to continue its business operations in the manner described in the First Day Motions.

5. I submit this Declaration, pursuant to Rule 1007-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, to provide an overview of the Debtor, its business, and the chapter 11 case, as well as to support the Debtor's chapter 11 petition and the First Day Motions. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge and my discussions with the Debtor's advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. In making this Declaration, I have relied in part on information and materials that the Debtor's advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.

6. Part I of this Declaration provides an overview of the history and business operations. Part II provides an overview of the Debtor's and capital structure. Part III provides an overview of the circumstances leading to the commencement of this chapter 11 case. Part IV provides an overview of the Term Sheet. Part V summarizes the First Day Motions.

## I. The Debtor's History and Business Operations

7. The Debtor is a Delaware corporation with its principal assets and business operations in California. The Debtor is owned by approximately 35 individuals and entities that own stock in the Debtor in the form of Preferred Series A Stock, Preferred Series B Stock, and common stock (with Preferred Series B stock having priority payment status over Preferred Series A Stock and Preferred Series A Stock having priority payment status over common stock).

8. The Debtor was incorporated in 2011 to further develop and commercialize certain electroadhesion technology developed by SRI International ("SRI"), which licenses its technology to the Debtor.[3]

9. The Debtor is an intelligent automation systems provider with proprietary electroadhesion technology capable of making significant advances for the consumer and industrial products manufacturing and warehouse logistics industries. It generates revenues through the sale of electroadhesion-based solutions for robotics, material handling, and industrial automation, with a focus on complete, customized solutions for manufacturing and warehouse logistics applications. Its technologies increase the safety and efficiency of its clients' businesses. The Debtor markets its solutions to manufacturing, logistics, assembly, robotics, aerospace, waste management, and transportation industries throughout the United States.

10. As of the date hereof (the "Petition Date"), I am the Debtor's sole employee. The Debtor is party to various consulting agreements with former employees who provide essential services and personnel to meet the Debtor's business, commercial, and technical needs.

11. Although the Debtor historically operated out of leased premises in Santa Clara, California, as of the Petition Date, the Debtor no longer operates out of a leased office or other facility. The Debtor's physical assets were either sold or disposed of pre-petition or are being held by Korvis, LLC ("Korvis"), a wholly-owned subsidiary of BPG. The Debtor outsources its manufacturing needs.

12. As part of its business operations, the Debtor also owns and manages a portfolio of intellectual property assets in connection with the technologies it has developed.

---

[3] *See* https://www.sri.com/engage/products-solutions/electroadhesion.

13. The Debtor has one non-operating, wholly-owned subsidiary, Grabit International, which is not a debtor in this case.

14. The Debtor's net sales totaled approximately $2.1 million in 2017 and in 2018, with negative EBITDA in excess of $6.0 million for each of those years. As of December 15, 2019, the Debtor's net sales totaled approximately $350,000, with an EBITDA loss of approximately $2.0 million.

15. As of the September 30, 2019, the Debtor had assets (at book value) of approximately $600,000 and liabilities of approximately $13.3 million.

## II. Pre-Petition Indebtedness and Capital Structure

### a. Pre-Petition Senior Secured Loan

16. The Debtor is indebted to BPG, the Supporting Senior Secured Lender, under the Senior Secured Note and Financing Documents. The Senior Secured Note is a revolving loan in an amount up to $9 million which is evidenced by the Financing Documents. The obligations under the Senior Secured Note are secured by a first priority, duly perfected senior Lien on all or substantially all of the Debtor's assets.

17. Under the Financing Documents, the Debtor is bound by certain EBITDA covenants. The Financing Documents include certain provisions pursuant to which BPG may acquire the Debtor.

18. As of the Petition Date, the Debtor was indebted to BPG under the Financing Documents in an amount no less than $5,500,000 in principal, plus accrued interest (which was no less than $298,222.24 as of November 30, 2019), attorneys' fees and other costs.

**b. The Convertible Notes**

19. In 2017 and 2018, the Debtor raised in excess of $7 million through the issuance of certain Convertible Notes. As of the Petition Date, the Convertible Notes were outstanding in the amount of approximately $15.9 million.

**c. Other Unsecured Debt**

20. Prior to the Petition Date, the Debtor generally paid its trade debts and operating expenses as they came due to, other than to the Supporting Senior Secured Lender and its affiliates. As of the Petition Date, the Debtor owes approximately $105,000 under consulting and transition agreements pursuant to which certain severance obligations are being waived.[4] In addition, the Debtor owes approximately $1.1 million to Korvis, Inc., a subsidiary of the Supporting Senior Secured Lender, under an executory manufacturing agreement between the Debtor and that entity.

**a. Stockholders, Options and Warrants**

21. Certain Holders of Convertible Notes also hold stock in the Debtor, which is payable only after the Convertible Notes are paid in full, with interest and a change-in-control premium, if applicable. Grabit has 10 Holders of Preferred Series B Stock, each of which also holds Convertible Notes. Holders of Preferred Series B Stock are the highest priority shareholders, with an aggregate liquidation preference of over $24 million, including an agreed 2-times multiplier used to calculate the liquidation preference. Preferred Series B Stock consists of approximately 46% of the total preferred shares in Grabit.

---

[4] Prior to the Petition Date, the Debtor's board approved a Key Service Provider Retention Plan (the "KEIP") which would entitle certain of the Debtor's key employees to payments upon a distribution to shareholders. If confirmed, the Plan, which contains certain negotiated earnout and management incentive payments, would supersede the amounts due under the KEIP.

22. Grabit has Holders of Preferred Series A Stock, each of which also holds Convertible Notes. Holders of Preferred Series A Stock are the next highest priority shareholders, with an aggregate liquidation preference of approximately $5.8 million (Preferred Series A Stock does not have a multiplier). Preferred Series A Stock consists of approximately 54% of the total preferred shares in Grabit.

23. Grabit's final form of stock is held by its Holders of Common Stock. The Holders of Common Stock include corporations, current and former employees, and other individual investors. Grabit has 33 Common Stock certificates outstanding, with certain Holders of Common Stock holding more than one Common Stock certificate.

24. Grabit also has issued certain Common Stock options to employees and investors, as well as series B warrants to Holders of Preferred Series B Stock. Based on the status of the Debtor, it is not anticipated that any of the options or warrants will be exercised. If they are, they will be treated like other Holder of Common Stock of Holder of Preferred Series B Stock under the proposed Plan pre-confirmation. If such options or warrants are not exercised by confirmation, they will be terminated under the terms of the Plan on the Effective Date.

## III. Circumstances Leading to Commencement of the Chapter 11 Case

25. Although electroadhesion technology has many potentially promising applications, the Debtor encountered unforeseen difficulties developing and monetizing its electroadhesion-based solutions.

26. For example, beginning in 2013, the Debtor focused on the development of robotic grippers for industrial applications. The Debtor soon learned that selling grippers was not lucrative. In 2014, the Debtor switched its focus to complete solutions for manufacturing and warehouse logistics applications. These solutions leveraged the Debtor's experience with electroadhesion grippers but also incorporated a robotic arm, vision, software, and completed material transport.

Although these additions enhanced the Debtor's ability to provide solutions to its clients, these solutions were more difficult to operationalize than the Debtor had originally anticipated.

27. In 2016, the Debtor encountered challenges finding new investors. These challenges were attributed to a variety of circumstances including perceived scaling difficulties and delays in product proliferation. As a result of these challenges, the Debtor reduced expenses by lowering the number of its employees and cutting back on development spending.

28. Although the Debtor continued to receive interest from and engage with potential customers, it was unable to take on new projects due to its lack of financial resources.

29. Accordingly, the Debtor searched for additional funding, hoping to find new investors. Unable to raise essential capital in this way, the Debtor turned to the only potential source of funding to continue in business: debt financing. In June of 2018, the Debtor and BPG executed the Financing Documents with the goal of advancing electroadhesion technologies for customers of both the Debtor and BPG.

30. The Debtor started 2019 with a promising outlook, buoyed by its newly secured funding and anticipating a large order that one of its largest clients indicated would be placed. Unfortunately, in February of 2019, the anticipated order was reduced due to a reduction in the client's 2019 capital expenditures budget. That development required the Debtor to inform BPG that it would not be able to meet the EBITDA covenants under the Financing Documents.

31. In March of 2019, the Debtor further reduced its expenses by letting go employees and reducing employee salaries. In April 2019, the Debtor further reduced its expenses by eliminating additional employee positions and terminating its office lease.

32. The Debtor continued to evaluate its strategic options, searching for new investors, additional debt, or a buyer for its assets. The Debtor also contemplated a chapter 11 bankruptcy

filing and began negotiating the Term Sheet (as set forth in more detail in Part IV, *infra*) with BPG, SRI, and its Holders of Convertible Notes, Preferred Series A Stock, Preferred Series B Stock, and Common Stock.

33. In October 2019, the Debtor reduced its payroll to three employees and entered into consulting agreements with certain critical former employees, and in November 2019, the Debtor further reduced its staff to one employee (myself), working for 50% of former salary. Like the employees terminated in October 2019, the employees terminated in November 2019 provided critical services to the Debtor. Accordingly, after their termination, they entered into consulting agreements with the Debtor to continue providing such services on a limited basis.

34. Notwithstanding the distressed situation, the Debtor continues to advance its electroadhesion technologies and has strong relationships with its clients. In addition, the Debtor continues to field inquiries from potential new customers and is working on a new program with a large potential client.

## IV. The Term Sheet

35. The Debtor and its advisors engaged extensively with BPG, SRI, and the Holders of Convertible Notes, Preferred Series A Stock, Preferred Series B Stock, and Common Stock (collectively, the "Parties") through the Spring and Summer of 2019 with the goal of getting the Parties to agree on the terms for a consensual reorganization. Shortly after the salient terms of the Term Sheet were negotiated in the Summer of 2019, an unrelated third party expressed an interest in a potential transaction concerning the Debtor's business. Implementation of the Term Sheet was put on hold at the request of the Debtor to explore the potential transaction with the third party. After approximately two months of due diligence, the third party declined to deliver any letter of intent and determined not to pursue a transaction with the Debtor.

36. Accordingly, in November 2019, the Debtor and the Supporting Senior Secured Lender recommenced their preparation for the transactions set forth in the Term Sheet, including preparation for the instant Chapter 11 Case. On December 11, 2019, after months of good faith and arm's-length negotiations, the Debtor was able to secure the agreement of all Holders of Convertible Notes (except one), all Holders of Preferred Series A Stock and Preferred Series B Stock (except one), and over 70% of the Holders of Common Stock in amount.[5] The Parties to the Term Sheet agreed, among other things, that, on the Effective Date of the Plan (the "Effective Date"):

a. BPG will convert all amounts owing with respect to the Supporting Senior Secured Claims to a single class of new common stock (the "New Common Stock") of the Reorganized Debtor, as reorganized pursuant to the Plan;

b. New governing documents for the Reorganized Debtor will take effect; and

c. The Reorganized Debtor will be a wholly-owned subsidiary of BPG. Its primary function will be to hold Grabit's intellectual property portfolio, serve as a research and development organization for further development of the Reorganized Debtor's intellectual property, and to support business development efforts with respect to the sale and marketing of the Reorganized Debtor's products.

37. The Term Sheet further outlines the treatment of the Debtor's various constituents under the Plan. Among other things, it provides:

a. **Class A**: BPG's claim will be converted to New Common Stock. Class A is impaired under the Plan and entitled to vote.

b. **Class B**: Holders of other priority claims under section 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), other than administrative claims and priority tax claims, will be paid in full in cash on the later to occur of (1) the Effective Date and (2) in the ordinary course of business. Class B is unimpaired under the Plan and deemed to accept the Plan.

[5] More specifically, the following Parties executed the Term Sheet: (i) the Debtor, (ii) all of the Debtor's Preferred Series A Stock and Preferred Series B Stock (except one such Holder), (iii) 70% of the Debtor's common stock holders, and (iv) 100% of the Debtor's Convertible Noteholders (except one).

c. **Class C-1**: Holders of Convertible Notes will be entitled to their pro rata share (among holders of Class C-1 Claims) of the Waterfall Consideration until their Claims are paid in full with interest, subject to the MIP Compensation (defined below) as set forth in Exhibit B to the Term Sheet. Class C-1 is impaired under the Plan and entitled to vote on the Plan.

d. **Class C-2**: Holders of certain rights under the KEIP will be entitled to their pro rata share (among holders of Class C-2 Claims) of the Waterfall Consideration (the "MIP Compensation"), as set forth in Exhibit B to the Term Sheet. Class C-2 is impaired under the Plan and entitled to vote on the Plan.

e. **Class C-3**: All other holders of any general unsecured claim, including unsecured trade claims, not classified in Class C-1 or Class C-2 will be paid in full in cash on the later to occur of (1) the Effective Date and (2) in the ordinary course of business. Class C-3 is unimpaired under the Plan and deemed to accept the Plan.

f. **Class D**: In full satisfaction of their Interests in Debtor, all existing Holders of Interests in the Debtor will be cancelled and holders of Interests will waive any and all other claims or causes of action, whether or not related to their Interests. In exchange, each holder of allowed Classes D-1 through D-3 Interests will be entitled to its applicable share among holders of Classes D-1 through D-3 interests, as applicable, of any remaining Waterfall Consideration after satisfaction of the Class C-1 Noteholders, subject to the MIP Compensation.

Options/warrants: All options and warrants to purchase Common Stock or Preferred Series B Stock, as applicable, of the Debtor (an "Option") that have not been exercised on the Effective Date will be deemed cancelled on the Effective Date. Any Option that is exercised after the bankruptcy filing through the record date will be treated in Class D-1 or D-3, as applicable, and entitled to vote on the Plan as a Class D-1 or D-3 Interest Holder, as applicable. Any Option that is exercised after the record date shall be treated as a Class D-1 or Class D-3 Interest Holder, as applicable, but not entitled to vote on the Plan.

38. The Term Sheet provides that, if necessary, BPG will extend priming debtor-in-possession financing to the Debtor. Because such financing is necessary for the Debtor to continue to operate through the reorganization process, the Debtor and BPG agreed to a DIP Facility that will enable the Debtor to complete the chapter 11 process successfully.

39. The reorganization is expected to eliminate more than $5.5 million of the Supporting Senior Secured Claims, and the Reorganized Debtor will emerge from bankruptcy a much stronger company, with a sustainable capital structure aligned with its present and future operating prospects.

40. The Parties agreed, subject to the terms and conditions set forth in the Term Sheet, *inter alia*, to support the Plan.

## V. First Day Motions[6]

41. To facilitate its restructuring efforts, the Debtor has concurrently filed the First Day Motions and respectfully requests that this Court enter the proposed orders granting same. I have reviewed each of the First Day Motions and proposed orders (including the exhibits thereto), and the facts set froth therein are true and correct to the best of my knowledge, information, and belief. The relief sought in the First Day Motions (i) is vital to enable the Debtor's transition into and operate in chapter 11 with minimum interruption or disruption to its business and (ii) constitutes a critical element in maximizing value during this chapter 11 case.

### A. Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a), 345, 363(b), 363(c), and 503(b) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2 (I) Authorizing Continued Maintenance of Pre-Petition Bank Accounts and Payment of Pre-Petition Obligations and (II) Authorizing Continued Use of Existing Business Forms (the "Bank Account Motion")

42. By way of the Bank Account Motion, the Debtor seeks, *inter alia*, (i) authority to designate, maintain, and continue to use its pre-petition Bank Accounts, (ii) a waiver of certain operating guidelines relating to bank accounts set forth in the United States Trustee Guidelines, (iii) a finding that it has satisfied the requirements of section 345(b) of the Bankruptcy Code, and (iv) authority to continue to use its existing Business Forms without alteration or change and without the designation "Debtor in Possession" imprinted upon them. The Debtor has sufficient controls in place to ensure that pre- and post-petition funds are properly accounted for. The relief requested in the Bank Account Motion will facilitate the Debtor's orderly transition into

[6] Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in the respective First Day Motion being addressed.

bankruptcy and ensure that the Debtor's employee and agents can focus their attention on the important matters at stake, such as maximizing value for the Debtor's estate, as opposed to ministerial matters such as opening new bank accounts.

**B. Motion of Debtor for Entry of Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) and (e), 364(c), (d) and (e), 503, and 507(b), (I) Authorizing the Debtor to (A) Obtain Financing on an Interim and Final Basis and (B) Utilize Cash Collateral of Pre-Petition Lender on an Interim and Final Basis, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling a Final Hearing Authorizing Financing on a Final Basis Pursuant to Bankruptcy Rule 4001(b) and (c)**

43. The Debtor requires immediate access to liquidity to (i) fund ordinary course working capital needs and chapter 11 administrative expenses and (ii) effectuate a reorganization of its business. The DIP Facility provides such liquidity in the form of a senior secured DIP Facility in the aggregate principal amount of up to $475,000. Up to $35,000 of the DIP Facility will be available to the Debtor upon entry of the Interim Order. The Debtor has agreed to provide adequate protection for the DIP Lender's interests under the Financing Documents, in the form of liens on the Debtor's assets, replacement liens on all other assets, and superpriority claims as provided for in section 507(b) of the Bankruptcy Code for any diminution in the value of the interest in the Prepetition Collateral, including, cash collateral. All such liens and superpriority claims shall be subordinated to the DIP Liens and the DIP Claims, but senior to any and all other liens and claims, with the exception of the Carve-Out.

44. The DIP Facility is a critical part of the Plan and the Term Sheet. It provides substantial value to the Debtor and its estate. Moreover, the DIP Facility represents the best source of financing available to the Debtor under the circumstances and was negotiated at arm's length with the DIP Lender, resulting in terms that the Debtor submits are reasonable and appropriate to meet the Debtor's financing needs during the chapter 11 case. The Debtor has not been able to

obtain an alternative financing commitment on terms better than those proposed by the DIP Lender, or, indeed, on any other terms. Although the DIP Facility contemplates a priming of pre-petition secured interests, the DIP Lender is the holder of such pre-petition secured interests and has consented to such priming in the context of the global resolution of this case.

**C. Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code and Bankruptcy Rule 3001 Establishing Notice and Hearing Procedures for Trading in Equity Securities of Debtor Grabit, Inc. (the "NOL Motion")**

45. By way of the NOL Motion, the Debtor seeks to establish procedures for trading in the Debtor's equity securities. Such procedures are necessary to protect and preserve the value of the Debtor's federal and state tax attributes, including but not limited to, significant net operating loss carryforwards (the net operating loss carryforwards, collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits and other tax attributes, the "Tax Attributes").

46. In the absence of the relief requested in the NOL Motion, trading in the Debtor's equity securities could severely limit or even eliminate the Tax Attributes, which could lead to significant negative consequences for the Debtor, its estate, creditors, and other stakeholders. To preserve, to the fullest extent possible, the Tax Attributes, the Debtor seeks limited relief that will enable the Debtor to closely monitor certain transfers of its equity securities, so as to be in a position to act expeditiously to preserve its Tax Attributes. Thus, the Debtor requests that the Court grant the relief requested in the NOL Motion in order to preserve the *status quo*.

**D. Debtor's Motion for an Order (I) Establishing Bar Dates for Filing Proofs of Pre-Petition Claims, Including Section 503(B)(9) Claims, and (II) Approving the Form and Manner of Notice Thereof (the "Bar Date Motion")**

47. The Debtor has filed the Bar Date Motion on the first day of this case in order to (i) establish Bar Dates for the filing of pre-petition proofs of claim, including 503(b)(9) Claims,

and (ii) set procedures for providing notice of the Bar Dates. Although unconventional, such relief is appropriate in this case in light of (i) the small number of creditors at issue, (ii) the high level of pre-petition engagement in this restructuring process on the part of the Debtor's Holders of Convertible Notes, Preferred Series A Stock, Preferred Series B Stock, Common Stock, and other constituents, (iii) the milestones set forth in the DIP Facility as well as the DIP Budget, and (iv) the terms of the Term Sheet. Specifically, by filing the Bar Date Motion on the first day of this case, the Debtor will be able, among other things, to set a General Bar Date approximately forty-five days after the Petition Date. The early determination of the Bar Dates will ensure that the Debtor can comply with its obligations under the DIP Facility, the DIP Budget, and the Term Sheet. Finally, setting Bar Dates early in this case will enable the Debtor and BPG to evaluate all scheduled and filed claims in advance of confirmation and will provide certainty with respect to the claims pool. This will permit BPG to determine, in an informed manner, whether it wishes to proceed with the Plan and will provide the Debtor with ample opportunity to formulate an alternative exit from bankruptcy if BPG elects not to proceed with the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 18, 2019

Greg Miller
President and Chief Executive Officer
Grabit, Inc.